Slip Op. 04-119

United States Court of International Trade

Before: Richard K. Eaton, Judge

|  |  |  |
|---|---|---|
| | : | |
| American Bearing Manufacturers Association, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 03-00280 |
| | : | Public Version |
| United States, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| Peer Bearing Co., Ningbo Mos Group, Ningbo | : | |
| Cixing Bearing, Ningbo Huanchi Group, | : | |
| Wangxiang Group Corp., Ningbo General | : | |
| Bearing Co., Ltd., Jiangsu General Ball and | : | |
| Roller Co., Ltd., | : | |
| | : | |
| Defendant- | : | |
| Intervenors. | : | |
| | : | |

[Plaintiff's motion for judgment upon an agency record denied; United States International Trade Commission's negative final determination sustained]

Dated: September 16, 2004

*Covington & Burling* (*Harvey M. Applebaum, David R. Grace, Karin L. Kizer, Nathan T. Daschle, Ariadna Vazquez*), for Plaintiff.

*James M. Lyons*, Acting General Counsel, United States International Trade Commission (*Charles A. St. Charles*), for Defendant.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch; *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch (*Claudia Burke*), for Defendant.

*Coudert Brothers, LLP* (*Matthew J. McConkey*), for Defendant-Intervenor Peer Bearing Co.

*Wilmer Cutler Pickering, LLP* (*Jason E. Kearns*, *John D. Greenwald*, *Jack A. Levy*, *Lisa M. Pearlman*), for Defendant-Intervenors Ningbo Mos Group, Ningbo Cixing Bearing, Ningbo Huanchi Group, Wangxiang Group Corp., Ningbo General Bearing Co., Ltd., Jiangsu General Ball and Roller Co., Ltd.

OPINION

EATON, *Judge*: Before the court is plaintiff American Bearing Manufacturers Association's[1] ("ABMA") U.S.C.I.T. Rule 56.2 motion for judgment upon an agency record challenging the United States International Trade Commission's ("ITC") final determination made pursuant to 19 U.S.C. § 1673d(b)(1)(A) (2000), that an industry in the United States is neither materially injured, nor threatened with material injury, by reason of dumped imports of ball bearings, and parts thereof, from the People's Republic of China.[2] *See* Ball Bearings From China, 68 Fed. Reg.

---

[1]     The American Bearing Manufacturers Association is a trade association, a majority of whose members produce ball bearings or parts thereof. *See* Compl. ¶ 2.

[2]     The United States Department of Commerce found that the subject imports had been sold at less than fair value. *See* Certain Ball Bearings and Parts Thereof From the P.R.C., 68 Fed. Reg. 10,685 (ITA Mar. 6, 2003) (notice of final determination of sales at less than fair value). The scope of the ITC's investigation covered

> all antifriction bearings, regardless of size, precision grade, or use, that employ balls as the rolling element (whether ground or unground) and parts thereof (inner ring, outer ring, cage, balls, seals, shields, etc.) that are produced in China. Imports of these products are classified under the following categories: antifriction balls, ball bearings with integral shafts and parts thereof, ball bearings (including thrust, angular contact, and radial ball bearings) and parts thereof, and housed or mounted ball bearing units and parts thereof. The scope includes ball bearing type pillow blocks and parts thereof; and wheel hub units incorporating balls as the rolling element. With regard to finished parts, all such parts are included in the scope of the petition. With regard to

(continued...)

17,963 (ITC Apr. 14, 2003) (notice of final determination); Ball Bearings From China, USITC

Pub. 3593, Inv. No. 731-TA-989 (Apr. 2003), List 2, Doc. 408 ("Final Determination"). The

court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons below, the court sustains

the Final Determination.


BACKGROUND

On February 13, 2002, in response to a petition filed by ABMA, the ITC instituted an

investigation of ball bearings from the People's Republic of China. *See* Ball Bearings From

China, 67 Fed. Reg. 8039, 8040 (ITC Feb. 21, 2002) (notice of institution of investigation). As

with ball bearings in prior investigations,[3] those subject to the instant investigation were found to

"cover[] a continuum of products in many sizes and configurations," and the ITC treated the

continuum as the domestic like product. *See* Final Determination at 8. Ball bearings are used in

a wide range of products and industries, including the automotive, aerospace, agriculture, and

construction industries. *See* Staff Report at II-11.

_____

[2](...continued)
> unfinished parts, such parts are included if (1) they have been heat-
> treated or (2) heat treatment is not required to be performed on the
> part. Thus, the only unfinished parts that are not covered by the
> petition are those that will be subject to heat treatment after
> importation.

Mem. INV-AA-035 (Mar. 21, 2003), List 2, Doc. 393 ("Staff Report") at I-1 n.1.

[3]    The most recent prior investigation of ball bearings was a five-year review of
orders on bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore,
Sweden and the United Kingdom, completed in June 2000. *See* Certain Bearings from China,
France, Germany, Hung., Italy, Japan, Rom., Sing., Sweden, and U.K., USITC Pub. 3309, Invs.
Nos. AA-1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (June
2000) Vol. I ("2000 Review") at 3.

The ITC gathered information with respect to domestic and imported ball bearings for the period of January 2000 to December 2002.  Following its investigation made pursuant to 19 U.S.C. § 1677(7)(C)(i)–(iii), the ITC concluded that the domestic ball bearing industry was not being materially injured by reason of the subject imports.  *See* 19 U.S.C. § 1673d(b)(1)(A)(i); Final Determination at 30.  The ITC also determined that the domestic ball bearing industry was not threatened with material injury by reason of the subject imports.  *See* 19 U.S.C. § 1673d(b)(1)(A)(ii); Final Determination at 33.  ABMA appealed the ITC's final negative material injury and threat of material injury determinations to this Court pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i).

STANDARD OF REVIEW

The court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  It "requires 'more than a mere scintilla,' . . . but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).  In conducting its review, the court must take into account not only the evidence on the record that justifies the ITC's findings, but also "whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Suramerica de Aleaciones*

*Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (citing *Atl. Sugar*, 744 F.2d at 1562). However, the court's function is not to reweigh the evidence but rather to ascertain "whether there was evidence which could reasonably lead to the Commission's conclusion . . . ." *Matsushita*, 750 F.2d at 933. The possibility of drawing two inconsistent conclusions from the record evidence does not, in itself, prevent the ITC's determinations from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

DISCUSSION

ABMA contests, as unsupported by substantial evidence or otherwise not in accordance with law, the ITC's findings with respect to (1) whether the volume of subject imports was significant, (2) whether the effect of the subject imports on domestic prices was significant, (3) whether the subject imports have had a significant adverse impact on the domestic industry, and (4) whether the domestic industry is threatened with material injury by reason of the subject imports.

1.    *Volume*

The ITC's volume determination requires an evaluation of "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Here, the ITC concluded that the volume of subject imports was not significant, "rely[ing] primarily on *value* measures for apparent consumption, domestic shipments, and subject imports,

as [it had] in prior ball bearing investigations, and for the same reasons."[4]  Final Determination at

14 (emphasis added) (citing Ball Bearings From China, USITC Pub. 3504, Inv. No. 731-TA-

989,(May 2002) at 11; 2000 Review at 39; Ball Bearings, Mounted or Unmounted, and Parts

Thereof, From Arg., Aus., Braz., Can., H.K., Hung., Mex., P.R.C., Pol., Rep. Korea, Spain,

Taiwan, Turk. and Yugoslavia, USITC Pub. 2374, Inv. No. 701-TA-307 (Apr. 1991) at 19–20;

Antifriction Bearings (Other Than Tapered Rolling Bearings) and Parts Thereof, from F.R.G.,

Fr., Italy, Japan, Rom., Sing., Swed., Thail., and U.K., USITC Pub. 2185, Invs. Nos. 303-TA-

19–20, 731-TA-391–399 (May 1989) ("USITC Pub. 2185") at 67, 69, 71; Tapered Roller

Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Hung.,

P.R.C., and Rom., USITC Pub. 1983, Invs. Nos. 731-TA-341, 344 and 345 (June 1987) ("USITC

Pub. 1983") at 16).[5]  While the ITC recognized that there were "limitations presented by using

---

[4]        Information on complete ball bearings, ball bearing balls, and ball bearing parts other than balls was gathered by both value and quantity.  Final Determination at 13 (citing Staff Report, tbls. III-5–III-7).  As discussed *infra* Part 2, the ITC collected data on a total of fifteen products, including twelve complete ball bearings (products 1–12) and three loose ball bearing balls (products 13–15).  *See* Staff Report at V-3–V-4.

[5]        With respect to the significance of the volume of subject imports, as measured by value, the ITC found:

> [A]pparent domestic consumption declined during the POI, with the *value* of complete ball bearings, ball bearing balls, and other ball bearing parts dropping by $305.4 million, or 10 percent, between 2000 and 2002.  This decline was split almost evenly between nonsubject imports, which declined by $153.6 million, and the domestic like product, which declined by $163.1 million. As overall domestic consumption, domestic like product shipments, and nonsubject imports all fell, the volume of subject imports increased over the POI.  The *value of subject imports* of complete ball bearings, ball bearing balls, and other ball bearing parts increased by 8.5 percent between 2000 and 2002.  The market

(continued...)

value measures rather than quantity measures, such as the difficulty in determining whether

changes in value totals are caused by changes in product mix or changes in price," it nonetheless

decided to "rely on value-based indicators as the best measure for a continuum product that

includes a vast and disparate grouping of items differing in size, configuration, application, and

precision." Final Determination at 14–15.

ABMA argues that the ITC: (1) failed to adequately consider import *quantity* data in

---

[5](...continued)
> share held by subject imports *as measured by value* increased from
> 3.9 percent in 2000 to 4.7 percent in 2002. The *value of subject
> imports* of complete ball bearings increased by 5.6 percent between
> 2000 and 2002, and the market share held by subject imports of
> complete ball bearings increased from 4.1 percent in 2000 to 4.8
> percent in 2002. Shipments of domestically produced and
> nonsubject complete ball bearings declined by 8.0 and 17.2 percent
> respectively between 2000 and 2002. However, the market share
> held by the domestic like product increased, from 68.6 percent in
> 2000 to 70.4 percent in 2002. Thus, any market share gained by
> subject imports came at the expense of nonsubject imports rather
> than the domestic like product. While the volume of subject
> imports increased over the POI at a time when apparent domestic
> consumption slowed, the increases were modest, as was the
> absolute volume of subject imports in the U.S. market throughout
> the POI. At the end of the POI subject imports from China
> accounted for only 4.7 percent of apparent domestic consumption
> of complete ball bearings, ball bearing balls, and other ball bearing
> parts, and that market share had increased by less than one
> percentage point over the POI. The domestic like product
> accounted for over two-thirds of apparent domestic consumption,
> and this share increased over the POI. As noted, the small amount
> of market share gained by subject imports came at the expense of
> nonsubject imports. We find that the volume and the increase in
> volume of subject imports are not significant either in absolute or
> relative terms.

Final Determination at 21–23 (citations to record omitted) (emphasis added).

determining whether the volume of subject imports was significant, (2) failed to offer an adequate explanation for not considering such data, (3) failed to respond to arguments advocating the use of import quantity data, and (4) failed to consider the impact of unfairly traded imports in the context of the ball bearing marketplace. *See* Pl.'s Conf. Mem. Supp. Mot. J. Admin. R. ("Pl.'s Mem."); Pl.'s Reply Mem. Supp. Mot. J. Admin. R. ("Pl.'s Reply"). The court will address each argument in turn.

First, ABMA asserts that 19 U.S.C. § 1677(7)(C)(i) requires the ITC to consider the quantity of imports,[6] and that the ITC failed in its obligation when it allegedly "ignored substantial record evidence demonstrating that the volume of imports of complete Chinese ball bearings [based on quantity] was significant." Pl.'s Mem. at 17, 18. ABMA states that "[a]lthough the quantity data are included in the Staff Report, the Commission relegated its discussion of volume by unit-quantity to a footnote."[7] *Id*. at 17. Second, claiming that "import

---

[6]    In support of its argument, ABMA points to legislative history concerning causation, i.e., the ITC's determination of whether material injury is *by reason of* imports, which states: "The ITC investigates the conditions of trade and competition and the general condition and structure of the relevant industry. It also considers, among other factors, the *quantity*, nature, and rate of importation of the imports subject to the investigation . . . ." SEN. REP. NO. 96-249, at 74 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 460 (emphasis added).

[7]    In this regard, ABMA cites the following discussion of quantity data found in footnote 111 of the Final Determination:

> Measured by quantity, subject imports increased by 10.4 percent between 2000 and 2002, and market share rose from 20.8 percent to 26.4 percent. [*See* Staff Report, tbl. C-1-A]. Domestic market share fell from 35.9 percent to 32.9 percent, while nonsubject import share fell from 43.3 percent to 40.8 percent. *Id*. The market share of open market shipments of complete ball bearings

(continued...)

data measured in quantity for complete ball bearings pointed to a different conclusion than the

one the Commission reached using value to measure imports," ABMA argues that "the

Commission at a minimum should have evaluated both sets of data [i.e., value and quantity data,]

and explained why the volume numbers were not significant, instead of dismissing without a

reasoned explanation data that contradicted its conclusion." *Id*. at 19 (citing *Altx, Inc. v. United

States*, 167 F. Supp. 2d 1353, 1359 (2001), *aff'd* 370 F.3d 1108 (Fed. Cir. 2004)).  Third, ABMA

argues that the ITC "failed to address the domestic industry's arguments that Chinese imports

were significant when measured by unit-quantity." *Id*. at 18.  Fourth, ABMA contends that the

ITC's finding that the volume of subject imports, as measured by value, was not significant fails

to take into consideration the specific characteristics of the marketplace, in particular, that the

ball bearing market is price sensitive. *Id*. at 21.


Finally, ABMA argues that *Torrington Co. v. United States*, 16 CIT 220, 230, 790 F.

Supp. 1161, 1172–73 (1992), *aff'd* 991 F.2d 809 (Fed. Cir. 1993), cited in the Final

Determination, held that it was permissible for the ITC to use value data in the context of its

determination of whether to cumulate the imports, pursuant to 19 U.S.C. § 1677(7)(G), but does

not support the use of value data to evaluate the significance of import volume in the context of a

---

[7](...continued)
> held by subject imports as measured by value increased from 4.6
> percent in 2000 to 5.4 percent in 2002.  Calculated from [Staff
> Report, tbls. III-5, C-1-A].  Measured by quantity, subject imports
> increased from 21.0 percent of open market shipments of complete
> ball bearings in 2000 to 26.6 percent in 2002. *Id*.

Final Determination at 22 n.111.

material injury determination.  *See* Pl.'s Mem. at 18; Pl.'s Reply at 3.

The ITC responds that its "primary reliance on value-based measures of the volume of subject imports was supported by substantial evidence and otherwise in accordance with law." Def.'s Conf. Mem. Opp'n Pl.'s Mot. J. Agency R. ("Def.'s Resp.") at 15.  First, the ITC argues that 19 U.S.C. § 1677(7)(C)(i) does not require the ITC to use quantity-based measures of volume, and urges the court to defer to the ITC's primary reliance on value-based measures of volume as a permissible construction of the statute.  *Id*. (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).  In addition, the ITC insists that it considered the quantity data in the record and identifies express references to such data in the Final Determination.  *Id*. at 19 (citing Final Determination at 17 n.75, 18 nn.81–83, 22 nn.111, 114) ("The fact that references to quantity data appeared in footnotes does not detract from their discussion by the ITC, and is consistent with the ITC's reasonable reliance primarily upon value indicators.").  Second, the ITC states that it not only considered ABMA's arguments urging the use of import quantity data, but also considered its past practice, and the value and quantity data on the record gathered in the course of its investigation.  *Id*. at 15; *see* citation to past investigations *supra* at 6.  Third, the ITC asserts that it "explained its primary reliance on value data at length," specifically in its discussion of the conditions of competition.  *Id*. at 20 ("The ITC's path in relying on value-measures was abundantly clear.").  Fourth, with respect to considerations of the marketplace, such as price sensitivity, the ITC argues that ABMA "rest[s] [its arguments] on a presumption that ball bearings are highly price sensitive," but the ITC "did not find the ball bearing market to be marked by a high degree of price sensitivity . . . ."  *Id*. at 23

(citing Final Determination at 19).

As to its reliance on *Torrington*, the ITC argues that the court "expressly affirmed the ITC's practice of using value measures of import volume." Def.'s Resp. at 16. The ITC asserts that the court's holding in *Torrington* is on point with the issue involved here, "notwithstanding its consideration of subject import volume under a provision of the statute concerned with cumulation." *Id*. at 17. According to the ITC,

> [n]ot only is the product at issue ball bearings, as it was in *Torrington*, the statute is silent as to the means of measuring volume and the use of a value-based measurement is reasonable. The subject ball bearing imports consist of a vast array of configurations, applications, and precision ratings of ball bearings, units incorporating ball bearings, individual balls and races, and other ball bearing parts. Therefore, as in *Torrington*, "construction of aggregate data regarding the quantity of [ball bearing] imports would have been impractical due to variations in product sizes and weight per unit between complete bearings and parts."

*Id*. at 18 (quoting *Torrington*, 16 CIT at 230, 790 F. Supp. at 1173). The ITC urges the court to sustain its conclusion that the volume of subject imports was not significant.

With respect to the ITC's decision to rely primarily on value data to measure volume, the court finds the ITC's construction of 19 U.S.C. § 1677(7)(C)(i) to be reasonable. When faced with a question of statutory construction, the court must "determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citation omitted). The court's inquiry starts with the plain language of the statute, as the statute's text is "Congress's final expression of its intent, [thus] if

the text answers the question, that is the end of the matter." *Id*. at 882 (citations omitted);

*Chevron*, 467 U.S. at 842. However, if the statute's language does not compel a particular

interpretation, the court must use "all 'traditional tools of statutory construction' to determine

whether 'Congress had an intention on the precise question at issue' before we consider

deference to an agency interpretation." *Candle Corp. of Am. v. United States Int'l Trade*

*Comm'n*, 374 F.3d 1087, 1093 (Fed. Cir. 2004) (quoting *Chevron*, 467 U.S. at 483 n.9). Should

the court find that "a statute is ambiguous or Congress intentionally leaves interpretive gaps in

the language of a statute, courts must defer to agency interpretations of that statute so long as

those interpretations are not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Comm.*

*for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284, 1289 (Fed. Cir. 2004)

(quoting *Chevron*, 467 U.S. at 844). "In other words, if Congress has left room for an agency to

interpret a statute, courts can only inquire as to whether an agency's construction of that statute is

a reasonable interpretation." *Id*. (quotation omitted).

Turning to the statute in question here, 19 U.S.C. § 1677(7)(C)(i) directs the ITC to

evaluate the significance of the volume of imports of the subject merchandise, either in absolute

terms or relative to production or consumption in the United States, but does not specify whether

the volume of imports is to be measured in terms of the value of imports, the quantity of imports,

a combination of both, or indeed by some other measure. Nor does the legislative history clearly

favor a particular interpretation. While, as ABMA points out, the legislative history mentions

that the ITC considers the "quantity" of imports, it also states that quantity is but one of many

factors it considers. SEN. REP. NO. 96-249, at 74 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381,

460 ("[The ITC] also considers, among other factors, the quantity, nature, and rate of importation of the imports subject to the investigation . . . ."). What is clear, however, is that Congress recognized that in determining the significance of the volume, price effect, and impact of imports in the U.S. market, the ITC must evaluate the facts of each particular case, and the industry involved, and make its material injury determination accordingly. *See* SEN. REP. NO. 96-249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474 ("The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor . . . can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide. It is expected that in its investigation the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned."); *see also Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 778, 696 F. Supp. 642, 647 (1988) ("The Commission has discretion to make a reasonable interpretation of the facts."); *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087–88 (1988) ("[T]he Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation."). The decision of whether to rely primarily on quantity data, value data, or both, to measure the significance of import volume is precisely the type of decision that Congress has entrusted the ITC to make in light of the facts and circumstances of each particular case. "In other words, . . . Congress has left room for [the ITC] to interpret [the] statute, [thus the] court[] can only inquire as to whether [the ITC's] construction of that statute is 'a reasonable interpretation.'" *Comm. for Fairly Traded Venezuelan Cement*, 372 F.3d at 1289 (quoting *Chevron*, 467 U.S. at 844).

Mindful of the ITC's responsibilities in administering the antidumping statute, the court

finds the ITC's construction of 19 U.S.C. § 1677(7)(C)(i), with respect to its primary reliance on

value-based indicators to evaluate the significance of the subject imports, to be reasonable in

light of wide variations in the size, configuration, application, and precision of ball bearings. *See*

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 n.5 (Fed. Cir.

1992) (noting the ITC qualifies as an agency that "is by virtue of its responsibilities under the Act

and its expertise, entitled to the benefit of *Chevron* deference."); *Pesquera Mares Australes Ltda.*

*v. United States*, 266 F.3d 1372, 1380 (Fed. Cir. 2001) (quoting *United States v. Mead Corp.*,

533 U.S. 218, 229 (2001)) (concluding that "*Chevron* deference is due at least to those statutory

interpretations that are articulated in any 'relatively formal administrative procedure' . . ."). The

court's reasoning in *Torrington* is instructive. In *Torrington*, the court reviewed the ITC's

construction of the term "volume" in 19 U.S.C. § 1677(7)(G), the statute that authorizes the ITC

to cumulate imports under certain circumstances.[8] As with the statute in issue here, the

cumulation statute did not expressly require the ITC to use either quantity or value data to

evaluate the significance of import volume. *Torrington*, 16 CIT at 230, 709 F. Supp. at 1172. In

holding that "it was reasonable for the Commission to use value-based indices when considering

the volume of imports," the court noted the variations in ball bearings' "sizes and weight per unit

between complete ball bearings and parts." *Id*. at 230–31, 709 F. Supp. at 1173. The court found

that accepting the plaintiff's argument that the ITC "must analyze the volume of imports in terms

---

[8]      The cumulation statute provides that "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which" certain criteria have been satisfied, "if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i).

of quantity could lead to absurd results in investigations involving industries producing low quantities of high-value merchandise." *Id.*

Similarly, here the ITC explained why using quantity data could produce misleading results as to the impact of the subject imports on the domestic industry: "[I]t would present a distorted picture of the market to consider a commodity bearing costing less than one dollar as equivalent to a precision bearing costing hundreds or even thousands of dollars." Final Determination at 15 n.62. The ITC found that the size, configuration, application, and precision of complete and partial ball bearings vary widely. *Id*. at 15. Thus, the same considerations that led the *Torrington* court to find the ITC's construction of the term "volume" to be reasonable are present here and militate in favor of this court finding the ITC's construction of 19 U.S.C. § 1677(7)(C)(i) to be reasonable.

In addition, the ITC's use of value-based indicators to evaluate volume in the context of a ball bearing investigation is consistent with its past practice. "An action by the ITC becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) (internal citation omitted). In prior investigations of ball bearings dating back to 1987, the ITC relied, at least in part, on value-based indicators in the course of its material injury analysis. *See, e.g.*, USITC Pub. 1983 at 29; USITC Pub. 2185 at 67, 141; 2000 Review at 43; *see also Torrington*, 16 CIT at 230, 790 F. Supp. at 1170 (noting ITC's use of

value-based measurements to ascertain import volumes of bearing products in other

determinations). In the Final Determination, the ITC stated that it would rely primarily on value-

based indicators as it had done in past ball bearing investigations, "and for the same reasons."

Final Determination at 14. In the past, value-based measures have been found to be preferable

where, as here, the products under investigation vary in size, quality and application. *See, e.g.*,

USITC Pub. 1983 at 5. "Although not determinative, the construction of a statute by those

charged with its administration is entitled to great deference, particularly when that interpretation

has been followed consistently over a long period of time." *United States v. Clark*, 454 U.S. 555,

565 (1982) (citation omitted); *NLRB v. Bell Aerospace Co., Div. of Textron, Inc.*, 416 U.S. 267,

274–75 (1974) ("[A] court may accord great weight to the longstanding interpretation placed on a

statute by an agency charged with its administration."); *Tex. Crushed Stone Co. v. United States*,

35 F.3d 1535, 1541 n.7 (Fed. Cir. 1994) ("Prior agency practice is relevant in determining the

amount of deference due an agency's interpretation."). Thus, both past practice and deference to

the ITC's construction of the volume statute under *Chevron* support the ITC's use of a value-

based measure of volume.


Having found it permissible for the ITC to use a value-based measure of volume, the

court turns to ABMA's arguments with respect to whether substantial evidence supports the

ITC's volume determination. ABMA's arguments are not persuasive. First, ABMA contends

that "import data measured in quantity for complete ball bearings pointed to a *different*

conclusion than the one the Commission reached using value to measure imports . . . ." Pl.'s

Mem. at 19 (emphasis added). The ITC was faced with the difficult question of how to conduct

its analysis when the subject imports and the domestic like product were characterized by a wide variety of sizes and applications. In order to conduct its analysis, the ITC reasonably chose value as its measure of volume. Whether the record might support alternate findings based on other data is, of course, not the issue. The question is "whether there was evidence which could reasonably lead to the Commission's conclusion . . . ." *Matsushita*, 750 F.2d at 933. "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985) (citation omitted); *United States Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) (decision about what weight to give a particular piece of evidence is "at the core of [the] evaluative process"). The volume data on the record, based on value, indicate that while apparent domestic consumption decreased, and the share of consumption held by the subject imports increased over the period of investigation, the share of consumption held by the domestic like product increased as well. *See* Staff Report, tbl. C-4-A. Nonsubject complete ball bearing import shipments declined over the period of investigation, leading the ITC to conclude that "any market share gained by subject imports came at the expense of nonsubject imports" rather than the domestic like product. Final Determination at 23. The ITC found that the purchasers' questionnaire responses supported this conclusion. *Id*. n.117 (citing Staff Report at II-16) ("Thirty-two of 35 responding purchasers reported that other imports were the most competitive alternative to subject imports."). That another conclusion might be reached using another set of data is not significant, where, as here, the ITC used permissible data to reach its conclusion.

Second, ABMA argues that the ITC "ignored" quantity data and arguments made with respect thereto. It is clear from the Final Determination that the ITC neither ignored the quantity data in the record nor disregarded relevant arguments presented by the parties. In a section titled "Data Issues," the ITC discussed its decision to rely "primarily," not exclusively, on value data in the record. The ITC itself expressed that it "considered quantity data where appropriate." Final Determination at 15. Indeed, the ITC discussed quantity data as it related to demand, apparent domestic consumption, and shipments. *See, e.g.*, Final Determination at 17 n.75, 18 nn.81–83, 22 nn.111, 114. Moreover, the ITC plainly considered the parties' arguments with respect to the question of whether to use value or quantity data to measure apparent domestic consumption, domestic shipments, and the volume of subject imports. *Id*. at 13–14 (articulating ABMA's, a domestic producer's, and the respondents' arguments for and against the use of value and quantity data). While the ITC reached different conclusions with respect to the use of the various data, there is every indication that it took ABMA's arguments into account. Thus, ABMA's claim is without merit.

Finally, ABMA's argument that the ITC failed to take into consideration the characteristics of the marketplace, such as the importance of price, is unpersuasive. In the Final Determination, the ITC discussed the conditions of competition at length, and had before it information with respect to the importance of price in purchasing decisions. *See* Final Determination at 19. For example, the ITC determined on the basis of questionnaire responses that "[p]rice is a moderately important factor in purchasing decisions for ball bearings." *Id*. In reaching this determination, it found persuasive that

> [o]nly nine purchasers ranked [price] as the most important
> factor . . ., but 21 ranked it second and 18 ranked it third; quality
> was ranked as the most important factor by 31 respondents. Of the
> 22 purchasers that changed suppliers, 11 mentioned price as a
> reason for their change; other cited reasons were poor delivery and
> quality or performance problems.

*Id.* (citations to record omitted). "It is the Commission's task to evaluate the evidence it collects

during its investigation. Certain decisions, such as the weight to be assigned a particular piece of

evidence, lie at the core of that evaluative process." *United States Steel Group*, 96 F.3d at 1357.

Here, the ITC considered how price sensitive the ball bearing market reportedly was, examined

the evidence, and drew a different conclusion than the one reached by ABMA. That being the

case, it is clear from the record that the ITC took the characteristics of the marketplace into

account. Thus, the court finds no error in the ITC's conclusion with respect to the price

sensitivity of the ball bearing market. Therefore, as the evidence on the record reasonably

supports the ITC's conclusion that the volume of the subject imports, as measured by value, was

not significant, it is sustained.


2.      *Price Effects*

The ITC's price effects determination requires an evaluation of whether:

> (I) there has been significant price underselling by the imported
> merchandise as compared with the price of domestic like products
> of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses
> prices to a significant degree or prevents price increases, which
> otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii). Here, the ITC concluded that the subject imports did not have

significant price effects. *See* Final Determination at 27. In reaching this conclusion, the ITC gathered data for twelve complete ball bearing products and three loose ball bearing ball products.[9] *See id*. at 23 (citing Staff Report at V-3–V-4).

With respect to underselling, the ITC found that the subject imports had many times undersold the domestic like product, frequently by large margins. However, "there was no consistent correlation between subject import prices and domestic like product prices." *Id*. at 24. Thus, underselling was not found to be significant. In addition, the ITC found "no clear nexus between underselling and loss of domestic sales." *Id*. at 25. The ITC observed that "[d]omestic sales quantities fell similarly both for products where subject imports undersold the domestic like product and for products for which there were no reported sales of subject imports," and "confirmed allegations of domestic sales and revenues lost to subject imports over the POI are insignificant, amounting to less than one percent of the value of domestic producers' commercial shipments over the period." *Id*. (citing Staff Report, tbls. V-45–V-56, V-21, V-22). With respect to price-suppression and price-depression, the ITC found that "[t]he record . . . does not support a conclusion that subject imports suppressed or depressed prices for the domestic like product to a significant degree," noting that "[t]here is no consistent correlation between the presence of subject imports and the erosion of prices for the domestic like product." *Id*. at 26. The ITC acknowledged that declines in domestic prices for some products coincided with

---

[9]      A description of each of the fifteen products, including the model number, components, dimensions, and "ABEC" (Annular Bearing Engineering Committee) tolerance or precision grade, is contained in the Staff Report. *See* Staff Report at V-3–V-4. ABEC tolerance refers to a product's level of running accuracy and speed capability. The higher the tolerance, the greater the running accuracy and high speed capability. *Id*. at I-6 n.11.

underselling by the subject imports. *Id*. "[H]owever, for three of these products . . . the subject imports lost sales as well." *Id*. The ITC also examined the domestic industry's revenue losses and found them to be "modest in light of the size of the ball bearing market."[10] *Id*. The ITC found that the observed declines in some domestic prices occurred during a time when apparent domestic consumption contracted and demand declined. *Id*. at 27. The ITC thus concluded that the subject imports did not have significant price effects.

ABMA attacks the reliability and usefulness of the pricing data on which the ITC based its price effects determination. First, ABMA contends that the sample of products for which the ITC collected pricing information "represented an arbitrarily small sample of the thousands of ball bearing models sold in the U.S. market . . . ." Pl.'s Mem. at 23; Pl.'s Reply at 6 ("The ITC did not analyze a broad enough sample of products to make an informed judgment on the impact of Chinese imports on domestic prices."). ABMA argues that the ITC collected data for only seven complete ball bearings because, of the twelve complete ball bearings, five differed from the other seven only based on whether they had a tolerance of ABEC 1 or ABEC 3—a distinction ABMA contends is without commercial significance. Pl.'s Mem. at 23–24; Pl.'s Reply at 8 ("The practical harm of the ITC's error in separating ABEC 1 ball bearings from ABEC 3 ball

_____

[10]     To illustrate, the ITC noted:

> Had the domestic industry maintained the same price and the same market share in 2002 as it had commanded in 2000 for products 1, 3, 5, 7, 8, 9, 11, and 12 sold to end users, the increase in revenue would have been less than $8.0 million. The domestic industry's commercial sales in 2002 were $1.734 billion.

Final Determination at 26–27 (citations to record omitted).

bearings is that, by collecting information that was commercially meaningless, it tainted the

questionnaire pricing data and rendered its subsequent conclusions unsupported by substantial

evidence."). ABMA asserts that "[w]ith thousands of product types in the industry, [the ITC's]

decision to limit the number of products to only 7 complete ball bearing part numbers and three

types of loose balls would necessarily yield unrepresentative and unreliable pricing data."[11] Pl.'s

Mem. at 25.


Next, ABMA asserts that the ITC committed legal error by failing to investigate what it

characterizes as certain "discrepancies" between publicly available data from the Bureau of

Labor Statistics ("BLS") and the data collected by way of questionnaires. *See* Pl.'s Mem. at 25;

Pl.'s Reply at 8 (citing *Timken Co. v. United States*, 264 F. Supp. 2d 1264, 1280 (2003)) ("[BLS]

data pointed to flaws in the data the ITC staff collected, and . . . the ITC was legally required to

investigate these discrepancies."). In proceedings before the ITC, ABMA presented BLS data

which it claimed showed, *inter alia*, that the "prices for radial ball bearings fell approximately 10

percent" from 2000 to 2002 and that "prices for other types of antifriction bearings generally rose

by varying amounts." Final Determination at 25 n.130 (citing Staff Report, figs. V-37 & V-38).

ABMA argued that these data supported the conclusion that subject imports depressed domestic

prices because radial bearings accounted for almost all of Chinese imports. *Id*. The ITC rejected

---

[11]     ABMA mentions in passing that by segregating ABEC 1 data and ABEC 3 data the ITC departed from prior practice without explaining why it did so. Pl.'s Mem. at 24. The ITC rejects ABMA's contention, arguing "the ITC has no practice of including particular model numbers or specifications in pricing product lists." Def.'s Resp. at 26 n.10. ABMA cites no authority for this position in its memorandum, and the single ITC investigation cited in its Comments on Draft Questionnaires at 5 n.8 is not enough to establish a "practice." Therefore, the court is unconvinced by ABMA's argument.

this conclusion "in the absence of significant information on market conditions pertaining to the other types of antifriction bearings." *Id.* ABMA urges the court to find that the ITC acted arbitrarily by rejecting the BLS data without investigating "the apparent discrepancy between its arbitrary narrow selection of pricing data and the publicly available data." Pl.'s Mem. at 26.

Finally, ABMA takes issue with the ITC's finding that "the fact that domestic prices for certain pricing products (e.g., products 13, 14, 15) fell despite no reported subject import sales in those categories would tend to support the . . . conclusion . . . that factors other than subject imports were affecting prices." Final Determination at 25 n.130. In this regard, ABMA argues that "the ITC inappropriately relied on declining prices for domestically produced *balls*, for which there were no competing imports, to conclude that the declining prices of *complete ball bearings* were not caused by subject imports."[12] Pl.'s Reply at 9 (emphasis in original).

The ITC argues that each of ABMA's contentions is without merit. First, the ITC claims

---

[12]     ABMA also contends that "the Commission misinterpreted the [Average Unit Value or "AUV"] data for the ball bearing models for which questionnaire pricing data were compiled." Pl.'s Mem. at 23. In response, the ITC asserts:

> The ITC did not base its price effects findings on average unit values. Rather, for each of the 15 specific products, the ITC compared the weighted average sales price of the specific imported product in the specific quarter with the weighted average price of the same domestic product for the specific product in the specific quarter.

Def.'s Resp. at 32. It appears that the ITC compared weighted-average f.o.b. prices and quantities of the domestic like product and the subject imports for each quarter in the period of investigation. *See* Staff Report at V-3–V-22. There is no reference to AUVs in the Final Determination. ABMA's argument is thus misplaced.

that "the individual products for which the ITC obtained pricing information reflected a reasonable sample of total sales of the subject imports and domestic like product." Def.'s Resp. at 25. The ITC states it collected pricing information for fifteen products, including twelve complete ball bearings (not seven as ABMA contends) and three loose ball bearing balls, broken out by distribution channel (i.e., sales to end users and sales to distributors). The data collected "permitted a total of 30 potential comparisons in each of the 12 quarters for which price data was requested." *Id*. at 26. The products selected "focused on the intersection of the Chinese product [comprised mostly of radial ball bearings] and the competing, radial portion, of the domestic like product . . . ." *Id*. at 26–27. Thus, "the 15 products represent a very significant sample, particularly in terms of competition between the subject imports and the domestic like product." *Id*. at 27. Second, with respect to the relevance of the products' ABEC tolerances, the ITC notes that "the higher tolerance (ABEC 3) reflects greater running accuracy and higher speed capability." *Id*. at 26 (citing Staff Report at I-6 n.11). "Therefore, ABEC tolerance differences indicated likely price difference between items that otherwise have the same model number, components, and dimensions." *Id*.

Next, the ITC addresses ABMA's argument that BLS data indicated subject imports depressed domestic prices. The ITC "examined . . . price data published by the Bureau of Labor Statistics," and did "not reach [the] conclusion [that the subject imports depressed domestic prices] in the absence of significant information on market conditions pertaining to the other types of antifriction bearings." Final Determination at 25 n.130. In other words, the BLS data did not cover as wide a spectrum of merchandise as the questionnaires or provide information on

the conditions of the marketplace.  In addition, the ITC points out that ABMA does not contest

the ITC's decision not to rely on BLS data.[13]  *See* Def.'s Resp. at 28.  As such, "any conflict

plaintiff perceives between other record information and the BLS data was resolved with the

ITC's uncontested determination that it could not assign the BLS data the weight advocated by

the domestic producers."  *Id.*

Finally, the ITC argues that its consideration of domestic prices for loose ball bearing

balls in reaching its conclusion that "factors other than subject imports were affecting prices,"

Final Determination at 25 n.130, was proper for the following reasons.  First, "the scope of the

subject merchandise and the domestic like product included antifriction balls and other parts of

ball bearings as well as complete ball bearings."  Def.'s Resp. at 29 (citing Final Determination

at 4).  Second, "[t]he decline in prices for [loose ball bearing balls] notwithstanding the absence

of competing subject imports is certainly relevant when the issue is whether prices of the

domestic like product were depressed by the subject imports."  *Id.* at 30.  Third, the "reference to

products 13, 14 [and] 15 was an illustration of information on the record that contradicted the

inference plaintiff sought by emphasizing the BLS data."  *Id.*  The ITC argues that it supported its

price effects determination with a discussion of the record evidence, e.g., increases in domestic

prices for several products where there was competition from the subject imports, significant

sales of the subject imports in but a few categories, modest revenue losses to the domestic

industry in light of the overall market, and other market conditions such as a decline in demand.

---

[13]      ABMA confirmed that it "does not contend that the ITC was required to rely on [BLS] data."  Pl.'s Reply at 8.

*Id*. at 32. Thus, the ITC urges the court to find that its price effects finding is supported by substantial evidence and otherwise in accordance with law.

It is clear that the ITC was justified in its conclusions with respect to price correlation. Based on the data collected, the ITC made price comparisons and found that although the subject imports undersold the domestic like product, there was no consistent correlation between the prices of the domestic like product and the competing subject imports. With respect to underselling, the ITC found:

> For several products, prices for the subject imports and the domestic like product did not move in the same direction. This is also true on an aggregated basis. According to aggregate data presented by petitioner ABMA for eight ball bearing products sold to end users for which data on U.S. and Chinese products were obtained, domestic prices for complete ball bearings, when weighted by volume, actually rose between 2000 and 2001, as subject import prices dropped, and were essentially the same in 2002 as in 2000. Aggregate prices of subject imports for the same eight products fell by 6.1 percent between 2000 and 2002. This apparent lack of correlation is confirmed by the pricing data for products for which no sales of subject imports were reported. Domestic prices for sales of products 13, 14, and 15 all declined although no subject import sales were reported during the POI.

Final Determination at 24–25 (citations to record omitted). Similarly, with respect to price-suppression and price-depression, the ITC found:

> For several products where there was competition from the subject imports, prices for the domestic like product actually rose during the POI. We are mindful of petitioner's argument that such increases in prices were caused by the loss of volume discounts as large-volume sales were lost to subject imports, leaving higher prices for smaller sales volumes. However, there were few product categories in which subject imports gained sufficient sales, indicating that these sales were not being lost to subject imports on

> price competition. For example, for product 3 to end users,
> product 5 to end users, product 7 to distributors, and product 11 to
> end users, sales volume for both the domestic like product and
> subject imports fell over the POI. The price reported for end-user
> purchases of domestically produced product 1 rose by 27.6 percent
> between the first quarter of 2000 and the fourth quarter of 2002,
> and sales fell by 76.3 percent, or by 5.0 million units. Sales of the
> subject imports rose by only 172,099 units.

*Id*. at 26 (citations to record omitted). The evidence on the record, as summarized in the Staff

Report, supports these findings.

Turning to ABMA's arguments, the court finds, as an initial matter, that the ITC collected

data for fifteen products, including twelve complete ball bearings[14] and three loose ball bearing

balls. ABMA's main complaint with respect to the sample of products the ITC selected is that

the ITC distinguished otherwise identical products by ABEC tolerance, which, in ABMA's view,

was not a commercially significant distinction to make. However, it appears that distinctions

among various ABEC classes are commercially significant. *See* Staff Report at I-6 n.11

("Tolerance classes are 1, 3, 5, 7, and 9 (higher numbered classes correspond to higher

tolerances); these classes define the minimum and maximum manufacturing ranges for bearings

(for example, such tolerances govern the allowable variation limits on bore size, diameter, width,

and thickness as well as other error limitations)."). In this case, the pricing information gathered

from questionnaire responses revealed pricing distinctions among otherwise identical products.

For example, product 1 and product 2 are both described as "608ZZ-Radial ball bearing, single

---

[14]     The following products competed with the domestic like product: products 1
(Staff Report, tbl. V-1), 3 (*id*., tbl. V-4), 5 (*id*., tbl. V-6), 7 (*id*., tbls. V-7, -8), 8 (*id*., tbl. 9), 9 (*id*., tbls. V-11, -12), 11 (*id*., tbls. 14, -15), and 12 (*id*., tbls. V-16, -17).

row, deep groove. 8mm bore, 22mm OD, 7mm width, with two shields," but differ in that product 1 has an ABEC tolerance of 1 and product 2 has an ABEC tolerance of 3. *Id*. at V-3. In sales to end users, these products commanded different prices quarter to quarter.[15] *Compare* Staff Report, tbl. V-1 *with* tbl. V-3. Thus, the court agrees with the ITC that "distinctions based on ABEC tolerances [were] meaningful in the price analysis . . . ." Def.'s Resp. at 26 n.10. The court finds no error on the ITC's part in distinguishing products by ABEC tolerance.

ABMA also argues that the sample of products selected by the ITC is not representative of the ball bearing market as a whole. While it is the ITC's burden "to collect all data necessary to its investigation," generalized allegations that a sample of products is not representative are not enough to meet the threshold requirement to support such a claim. *Kern-Liebers USA, Inc. v. United States*, 19 CIT 87, 113, 114–15 (1995) (not reported in the Federal Supplement), *aff'd sub nom United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) (citing *Gen. Motors Corp. v. United States*, 17 CIT 697, 703, 827 F. Supp. 774, 781 (1993)). Rather, ABMA must "point[ ] to . . . quantitative evidence to indicate that the sampled data relied on by the Commission was not representative." *United States Steel Group*, 96 F.3d at 1366; *see also Kern-Liebers*, 19 CIT at 114–15 (finding "generalized affidavits" submitted by plaintiff "were of uncertain probative value and lacked much of the specific information the Commission uses in conducting pricing comparisons."). Here, ABMA asserts that there were "thousands of product types in the industry," and that the ITC's sample "would necessarily yield unrepresentative and

---

[15]     Over the period of investigation prices for product 1 ranged between $0.48 and $0.64 per unit, whereas prices for product 2 ranged between $0.27 and $0.33 per unit. Staff Report, tbls. V-1, V-3.

unreliable pricing data," but cites no record evidence to support this claim. Pl.'s Mem. at 25.

This broad allegation is not specific enough to meet the requisite threshold showing. Moreover,

the court notes that the selection of products chosen by the ITC encompasses many of the

products proposed by ABMA in its Comments on Draft Questionnaires, e.g., products 3, 4, 5, 6,

7, 8, 9, and 10. *See* Petitioner's Comments on Draft Questionnaires, Pub. R. Doc. 53 at 5–6.

Thus, ABMA has failed to make the requisite threshold showing to establish that the sample

selected by the ITC was unrepresentative.

The court next turns to ABMA's argument that the ITC failed to provide the legally

required explanation of how it reconciled the discrepancies between the pricing data it collected

and the publicly available data. ABMA cites *Timken Co. v. United States*, 264 F. Supp. 2d 1264

(2003), for the proposition that "where the 'ITC actively precludes itself from receiving relevant

data or [m]akes no effort to seek relevant [contrary] data . . . then such actions will be found to be

contrary to law.'"[16] Pl.'s Mem. at 26–27. The *Timken* court quoted this language from

*Mitsubishi Electric Corp. v. United States*, 12 CIT 1025, 1058, 700 F. Supp. 538, 564 (1988),

*aff'd* 898 F.2d 1577 (Fed. Cir. 1990), where the court reviewed the ITC's decision to invoke the

---

[16]     In *Timken*, the court concluded that the ITC's finding regarding foreign producers'
high capacity utilization rates could not be sustained. The ITC had based its capacity utilization
finding on questionnaire responses and had rejected secondary information presented by Timken
on the ground that "the reporting basis used in such [secondary] data was undefined." *Timken*,
264 F. Supp. 2d at 1280. The court remanded the matter to the ITC, reasoning: "With this
impetus, it is logical to find that the Commission erred by not inquiring into the basis used by the
[foreign] producers to report their capacity." *Id*. In other words, the court found that under the
ITC's own reasoning, it had acted inconsistently. The ITC had rejected certain data because its
reporting basis was undefined, yet it had made no effort to define the reporting basis of the
questionnaire data it affirmatively relied upon.

"product line" provision of the antidumping statute, 19 U.S.C. § 1677(4)(D).[17]  The *Mitsubishi*

court found that the ITC had failed in its duty to conduct a thorough investigation, where 19

U.S.C. § 1677(4)(D) was concerned, by not requesting reasonably available data that would have

permitted the "separate identification of production," pursuant to the statute.  The court stated:

> The Court is not in a position to determine what information is
> available to permit separate identification of production, but to
> review those type of decisions left to the discretion of the ITC.
> However, where the ITC actively precludes itself from receiving
> relevant data or takes no effort to seek relevant data contrary to §
> 1677(4)(D), which directs the ITC *shall* assess domestic
> production where available data exists and where that data is
> reasonably available for the ITC to collect and consider, then such
> actions will be found to be contrary to law.

*Mitsubishi*, 12 CIT at 1058, 700 F. Supp. at 564 (citation omitted).

ABMA essentially argues that the ITC was not thorough in its investigation, i.e., that it

failed to investigate certain perceived discrepancies between BLS statistics and questionnaire

data.  However, unlike *Mitsubishi*, this is not a case where the ITC shirked its duty to conduct a

_____

[17]     At the time of that decision, 19 U.S.C. § 1677(4)(D) read as follows:

> The effect of subsidized or dumped imports shall be assessed in
> relation to the United States production of a like product *if*
> *available data permit* the separate identification of production in
> terms of *such criteria* as the *production process* or the producer's
> profits.  If the domestic production of the like product has no
> separate identity in terms of such criteria, then the effect of the
> subsidized or dumped imports shall be assessed by the examination
> of the production of the narrowest group or range of products,
> which includes a like product, for which the necessary information
> can be provided.

19 U.S.C. § 1677(4)(D) (1985) (as quoted in *Mitsubishi*, 12 CIT at 1057, 700 F. Supp. at 563).

thorough investigation, or actively avoided seeking information where it had an obligation to do

so. In the Final Determination, the ITC discussed the data that ABMA argues the ITC should

have relied upon, and drew a conclusion that differed from the one ABMA urged with respect to

price-depression. Final Determination at 25 n.130 (discussing BLS data and party arguments).

Upon considering the BLS data, the ITC stated:

> We do not reach [the] conclusion [that BLS data indicate that the
> Subject Imports depressed domestic prices] in the absence of
> significant information on market conditions pertaining to the other
> types of antifriction bearings. Moreover, the fact that domestic
> prices for certain pricing products (e.g., products 13, 14, 15) fell
> despite no reported subject import sales in those categories would
> tend to support the opposite conclusion; namely, that factors other
> than subject imports were affecting prices.

*Id*. The ITC looked at the BLS data, found it wanting because it did not cover a broad enough

spectrum of the subject merchandise, and therefore concluded it was not probative of the market

as a whole. Because the ITC had data from the questionnaires that it felt covered the market

more completely, it chose to adopt the conclusion it believed was based on more complete data.

Therefore, it is clear that the ITC reviewed the BLS data, sought to analyze it in context, and

reached a different conclusion with which ABMA does not agree. The court finds no error on the

ITC's part in this regard.


ABMA's remaining argument, that the ITC improperly relied on information with respect

to loose ball bearing balls, is similarly without merit. As the ITC points out, the scope of the

ITC's investigation encompassed "all antifriction bearings, regardless of size, precision grade, or

use, that employ balls as the rolling element (whether ground or unground) *and parts thereof*

(inner ring, outer ring, cage, *balls*, seals, shields, etc.) that are produced in China."  Staff Report

at I-1 n.1 (emphasis added).  Therefore, the ITC acted consistently with the scope of the

investigation in examining pricing for loose ball bearing balls.  The ITC relied on such

information in its price effects analysis to confirm a lack of correlation between domestic prices

and the price of subject imports.  *See, e.g.*, Final Determination at 25 ("This apparent lack of

correlation is confirmed by the pricing data for products for which no sales of subject imports

were reported.  Domestic prices for sales of products 13, 14, and 15 all declined although no

subject import sales were reported during the POI."); *id*. at 25 n.130 ("Moreover, the fact that

domestic prices for certain pricing products (e.g., products 13, 14, 15) fell despite no reported

subject import sales in those categories would tend to support the opposite conclusion; namely,

that factors other than subject imports were affecting prices.").[18]  The ITC's discussion of price

declines for loose ball bearing ball products clearly served as additional support for its

conclusion that "factors other than subject imports were affecting prices," and was not the sole

basis for its price effects finding.  *See* Final Determination at 25 n.130.  In addition, the ITC

considered sales of products where the subject imports did compete with the domestic like

products and found increases in domestic prices even where some subject import prices dropped.

Final Determination at 26 (citing Staff Report, tbls. V-1 (product 1), V-15 (product 11)).  In

accordance with its authority to determine the significance and weight of any particular piece of

---

[18]        ABMA objects, arguing that loose ball bearing balls composed, by value, "only
.33 percent of the total U.S. market in 2002," and thus does not constitute support for the finding
that Chinese ball bearings did not cause price declines.  Pl.'s Mem. at 27.  Pricing data for
products 13, 14, and 15 accounted for 3.4% of domestic producers' sales, and thus, according to
the ITC, 0.33% was a meaningful percentage.  Def.'s Resp. at 30.  The court finds that the use of
this evidence is justified in light of other evidence tending to support the ITC's claims.

evidence, the ITC was justified in finding that declines in domestic prices of loose ball bearing balls, despite the absence of imports, were meaningful in determining whether the subject imports were adversely impacting domestic prices. *See United States Steel Group*, 96 F.3d at 1357.


3.      *Impact*

When examining the impact of imports on the domestic industry, the ITC is required to evaluate:

> all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—
>
> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
> (II) factors affecting domestic prices,
>
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
>
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
>
> (V) in [an antidumping duty] proceeding . . ., the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii). These factors must be evaluated "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id*.

Here, the ITC found that the subject imports did not have a significant adverse impact on

the domestic industry, saying:

> The domestic industry remained profitable throughout the POI. Operating income as a percentage of net sales was 4.4 percent in 2002, although it was down from 6.9 percent in 2000. Some erosion in the position of the domestic industry occurred over the POI. Shipments for all bearings declined, whether measured by value or by quantity, as did net sales. Capacity utilization rates declined. The number of production and related workers declined, as did hours worked and total wages paid, although hourly wages increased. Productivity also fell.
>
> Not all performance and financial indicators for the U.S. industry declined throughout the POI. The market share held by domestic producers, production capacity for complete ball bearings, and unit values of domestic shipments all increased over the period, as did the value of domestic producers' shipments between 2001 and 2002.
>
> Total capital expenditures fell during the POI, but five of the 20 reporting producers incurred substantial amounts of capital expenditures during each year of the POI. Expenditures on research and development declined over the POI but were somewhat higher in 2002 than in 2001. Additionally, a significant number of firms, including not only [certain] companies, which face little or no competition from subject imports, but also [other firms], who are members of ABMA, answered in the negative when asked if the firm had experienced any actual negative effects on its return on its investment or its growth, investment, ability to raise capital, existing development and production efforts, or the scale of capital investments, as a result of subject imports.
>
> The current decline in the performance of the domestic industry has occurred during a period of reduced demand. Indeed, the drop in apparent domestic consumption, at 10.0 percent, was sharper than the decline in the value of domestic shipments, which declined by only 8.0 percent during the same time period. The domestic industry did not lose market share to subject imports, but rather gained market share. The increase in the market share held by subject imports over the POI was less than one percentage point. The total increase in the value of subject imports of

complete ball bearings, ball bearing balls, and other ball bearing parts was equivalent to only 6.2 percent of the decline in the total value of domestic shipments during the POI. Subject imports did not have a significant negative effect on the price received for the domestic like product.

We already have found that neither the volume nor the increase in volume of subject imports was significant and that subject imports did not have a significant effect on the price of the domestic like product. In light of those findings, we do not find that subject imports have had a significant adverse impact on the domestic industry producing the domestic like product.

Final Determination at 28–30 (citations to record omitted).

ABMA argues that the ITC's impact determination is neither supported by substantial evidence, nor is otherwise in accordance with law. With respect to compliance with 19 U.S.C. § 1677(7)(C)(iii), ABMA argues that the ITC gave no indication in the Final Determination that it considered each of the factors required under the statute, and that the ITC did not consider the impact factors in light of the business cycle and conditions of competition in the industry. *See* Pl.'s Mem. at 29, 31. With respect to whether substantial evidence supports the ITC's impact determination, ABMA argues that the ITC ignored evidence with respect to "declines during the POI in (1) operating income as a percentage of net sales, (2) domestic shipments, (3) net sales, (4) capacity utilization, (5) employment, (6) total wages, (7) productivity, (8) total capital expenditures, and (9) research and development expenses." *Id*. at 29. In addition, ABMA argues that the ITC erroneously "relied upon a 4.4 percent operating income to net sales as evidence of profitability," a percentage that "was . . . considerably lower than the industry's historical profitability levels of between 6-8 percent and the levels during the 1989 antidumping

investigation, when the Commission determined that the industry was injured." *Id*. at 30

(footnote omitted). ABMA further argues that the ITC "appears to have erroneously concluded

that the industry's negative economic factors were the result of a decrease in demand," but that

other record evidence "contradicts this conclusion." *Id*.

Moreover, ABMA argues that the ITC misapplied its causation analysis by allegedly

"subjugat[ing] its consideration of impact to its consideration of volume and price effects . . .

[thus] fail[ing] to explain its analysis." Pl.'s Mem. at 33–34. ABMA contends that this is

apparent from the Final Determination, where the ITC stated:

> We already have found that neither the volume nor the increase in
> volume of subject imports was significant and that subject imports
> did not have a significant effect on the price of the domestic like
> product. *In light of those findings, we do not find that subject
> imports have had a significant adverse impact on the domestic
> industry producing the domestic like product.*

*Id*. at 33 (quoting Final Determination at 22) (emphasis as in Pl.'s Mem.). ABMA argues that

the language of the ITC's impact determination clearly shows that the ITC "considered impact on

the domestic market to be a product of the other two mandatory factors, rather than an

independent factor deserving its own consideration." *Id*.

With respect to compliance with 19 U.S.C. § 1677(7)(C)(iii), the ITC argues that it is

clear from the Final Determination that it considered the statutory impact factors and took

account of the condition of the industry in light of the business cycle and conditions of

competition. *See* Def.'s Resp. at 33–35 (quoting Final Determination at 28–29, 29–30). As it

considered the factors enumerated in the statute, the ITC argues that there is no basis for ABMA's argument that it failed to consider the impact of the subject imports as an independent factor in its causation analysis, and not just as a product of its volume and price effects findings. *Id*. at 36–37.

As to ABMA's substantial evidence arguments, the ITC states that it is "under no obligation to place dispositive weight on the pieces of information highlighted by plaintiff or the interpretations plaintiff would attach to those piece of information." Def.'s Resp. at 33. The ITC asserts that it did not, contrary to ABMA's assertion, "find that reduced demand was the cause of any injury but, rather, that the industry performed better than would have been expected in the face of reduced demand, and that the subject imports did not have a significant negative effect on the price received for the domestic like product." *Id*. at 35.

The court finds that the ITC complied with 19 U.S.C. § 1677(7)(C)(iii) in making its impact determination. Contrary to ABMA's argument, it is clear that the ITC considered each of the factors enumerated in the statute and the evidence on record concerning the domestic industry's financial and performance indicators. For example, based on evidence summarized in the Staff Report, the ITC found that the evidence indicated declines in operating income as a percentage of net sales, shipments, capacity utilization rates, the number of production and related workers, hours worked, total wages paid, and productivity. Final Determination at 28–29 (citations to record omitted). However, it also found that the domestic industry remained

profitable during the period of investigation,[19] *id*., and noted increases in the domestic producers'

market share, production capacity for complete ball bearings, unit values of domestic shipments,

and the value of domestic producers' shipments. *Id*. Significantly, some domestic firms

responded to ITC questionnaires indicating that they had not suffered any negative impact by

reason of the subject imports.[20] *See* Staff Report at D-3. The underlying record supports these

---

[19]        ABMA objects to the significance of the ITC's conclusion that the domestic
industry remained profitable despite a decline in profitability during the period of investigation,
arguing that profitability was "considerably lower than the industry's historical profitability
levels . . . ." Pl.'s Mem. at 30. In the Final Determination, the ITC observed that "[o]perating
income as a percentage of net sales was 4.4 percent in 2002, although it was down from 6.9
percent in 2000." Final Determination at 28. A decline in profitability over the period of
investigation would not in itself detract from the finding that the domestic industry "remained
profitable," as the overall profitability rate for the domestic industry in 2002, 4.4% operating
income to net sales, was positive, thus indicating some level of profitability. *See* Staff Report at
VI-3 ("Thirteen producers out of the total of 20 had an operating income for all periods and no
producers had an operating loss for the entire period."); *id*., tbl. VI-2. Moreover, that the
domestic industry's profitability levels here were lower than they were found to be in a prior
investigation, where the ITC found material injury by reason of imports, does not undermine the
ITC's finding. As this court has held, "[f]indings in related determinations regarding threat or
material injury are generally not dispositive on subsequent determinations. . . . [T]he
Commission does not and cannot determine a specific profitability level injurious because the
statute directs the Commission to evaluate a number of factors in determining the condition of
the domestic industry." *Torrington*, 16 CIT at 226, 790 F. Supp. at 1169 (citations omitted).
That is, each of the ITC's determinations is *sui generis*. *See Comm. for Fair Beam Imps. v.
United States*, 27 CIT __, __ slip op. 03-73 at 20 (June 27, 2003), *aff'd without opinion* 95 Fed.
Appx. 347 (Fed. Cir. 2004) (citation omitted) ("[I]t is [a] well-established proposition that the
ITC's material injury determinations are *sui generis*; that is, the agency's findings and
determinations are necessarily confined to a specific period of investigation with its attendant,
peculiar set of circumstances."). Operating income as a percentage of net sales is one factor
among those the ITC must consider in making its impact determination. Here, even though
operating income as a percentage of net sales was lower than it has been in the past the ITC
found that the domestic industry "remained profitable." The court finds no error with the ITC's
impact determination in this respect.

[20]        Of the twenty companies that responded, six of them answered "No" to the ITC's
question of whether the firm had experienced "any actual negative effects" on return on
investment, growth, ability to raise capital, existing development and production efforts, or

                                                                                    (continued...)

findings. In addition, the statute itself makes it clear that "[t]he presence or absence of any factor which the Commission is required to evaluate under [19 U.S.C. § 1677(7)(C)] . . . shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury." 19 U.S.C. § 1677(7)(E)(ii); *Comm. for Fair Beam Imps.*, 27 CIT at __, slip op. 03-73 at 36 (quoting *Am. Spring Wire Corp. v. United States*, 8 CIT 20, 23, 590 F. Supp. 1273, 1277 (1984)) ("[T]he ITC is not required to accord more weight to any factor of impact analysis at the expense of other factors. Specifically, '[n]o factor, standing alone, triggers a *per se* rule of material injury.'").

Next, the court does not agree that the ITC failed to consider the performance of the domestic industry in the context of prevailing market conditions during the period of investigation, as it is required to do by the statute. Indeed, such consideration is at the heart of the ITC's analysis. In the Final Determination, the ITC recited the conditions of competition in the industry it found relevant to its determination. *See* Final Determination at 16–21 (discussion of demand, supply, distribution and pricing, market segmentation, among other economic factors). For example, the ITC took into consideration the decline in demand experienced by the domestic industry during the period of investigation. It compared the rate at which apparent domestic consumption dropped with the decline in the value of domestic shipments, and found that the evidence showed a sharper rate of decline in apparent domestic consumption. Final Determination at 29; *see* Staff Report at II-11 ("Most U.S. producers and importers reported that

---

[20](...continued)
capital investments "as a result of imports of ball bearings from China." Staff Report at D-3.

demand for ball bearings was flat or decreased during 2000–2002."). The ITC noted that in spite of the reduction in demand, the domestic industry gained market share. *Id.* at 29–30. These findings, together with its finding that the subject imports increased their market share by "less than one percentage point" are borne out by the record. *See* Staff Report, tbl. C-4-A.

ABMA is correct that volume, price effects, and impact each require independent consideration. *See* Pl.'s Mem. at 33. The ITC has not failed in that obligation. Consistent with the statute, the ITC considered the factors enumerated in 19 U.S.C. § 1677(7)(C)(iii). Mentioning the ITC's volume and price effects findings in the context of its impact determination does not necessarily mean that its impact analysis was "subjugated" to its volume and price effects findings. Accepting this argument would require the court to overlook the analysis of the impact factors performed by the ITC and the findings it made with respect thereto. At base, ABMA's arguments go to the weight the ITC assigned to the observed declines in several of the statutory factors, such as operating income as a percentage of net sales, domestic shipments, net sales, capacity utilization, and employment indicators. This assignment of weight, however, is within the ITC's discretion. *Nat'l Ass'n of Mirror Mfrs.*, 12 CIT at 778, 696 F. Supp. at 647. The court may not reweigh the evidence, or substitute its judgment for that of the agency. *Matsushita*, 750 F.2d at 933. As the court finds the ITC's impact analysis to be supported by substantial evidence and otherwise in accordance with law, it is sustained.

4.      *Threat of Material Injury*

Next, the court turns to the ITC's finding that the domestic ball bearing industry was not

threatened with material injury by reason of the subject imports.  In making its threat

determination, the ITC is directed by statute to consider certain factors,[21] which must be analyzed

---

[21]      The factors are:

(I) [factor pertaining to countervailable subsidies],

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) [factor pertaining to agricultural products],

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the

(continued...)

"as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted . . . ." 19 U.S.C. § 1677(7)(F)(ii). "The presence or absence of any factor which the Commission is required to consider under [19 U.S.C. § 1677(7)(F)(i)] shall not necessarily give decisive guidance with respect to the determination." *Id.* "An affirmative threat determination must be based upon 'positive evidence tending to show an intention to increase the levels of importation,'" not mere speculation. *Metallverken Nederland B.V. v. United States*, 14 CIT 481, 488, 744 F. Supp. 281, 287 (1990) (quoting *Am. Spring Wire v. United States*, 8 CIT at 28, 590 F. Supp. at 1280).

ABMA's first challenge to the ITC's threat determination focuses on its finding with respect to Chinese production capacity. Pursuant to 19 U.S.C. § 1677(7)(F)(i)(II), the ITC found that during the period of investigation:

> subject foreign producers reportedly operated at high rates of capacity utilization and devoted a significant portion of their exports to markets other than the United States. The Chinese producers that responded to our questionnaires likely do not represent the entire Chinese industry producing ball bearings. Unreported capacity presumably existed during the entire POI, but did not lead to a significant volume of subject imports or significant negative price effects. We have no basis to conclude that this situation will change in the imminent future.

---

[21](...continued)
> probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i)(I)–(IX). Factors I and VII were not relevant to the ITC's determination.

Final Determination at 31–32 (citations to record omitted).  Thus, the ITC relied on questionnaire responses indicating high capacity utilization levels.  As summarized in the Staff Report, questionnaire responses indicated that capacity utilization was 87.0% in 2000, 82.9% in 2001, and 85.1% in 2002, and these rates were projected to increase in 2003 and 2004.  *See* Staff Report at VII-4.  Moreover, the record indicates that during the period of investigation roughly two-thirds of Chinese producers' total export shipments of complete ball bearings went to markets other than the United States, and roughly half of Chinese producers' ball bearing balls went to other markets as well.  *See id.*, tbls. VII-1-A, VII-2.

ABMA's arguments do not persuade the court that the ITC's analysis is not supported by substantial evidence.  ABMA contends that there is record evidence that the ITC failed to take into consideration.[22]  In particular, ABMA discusses what it dubs "official reports," which, it argues, conflict with the data reported in questionnaire responses.  Pl.'s Mem. at 35 (citing Pl.'s Prehearing Br., Ex. 7 (*World Bearings China Outlook*)).  For example, ABMA argues that the

---

[22]    In objecting that the ITC ignored evidence that suggests that Chinese production capacity was much higher than it was reported to be in the foreign producer questionnaire responses, ABMA criticizes the ITC's use of questionnaire responses.  Pl.'s Mem. at 34–35 (objecting to the ITC's use of questionnaire data to conclude that China was operating at high capacity utilization levels, arguing that such data "is of questionable value because it represents a mere fraction of the Chinese industry.").  In finding that "subject foreign producers reportedly operated at high rates of capacity utilization," the ITC relied on responses it received to foreign producer questionnaires, acknowledging that "[t]he Chinese producers that responded to our questionnaires likely do not represent the entire Chinese industry producing ball bearings."  Final Determination at 31–32 (citing Timken Prehearing Br., Vol. 1, at 38–43); Staff Report at VII-2 n.12 (noting ITC received 42 useable responses out of 175 sent out to Chinese ball bearing manufacturers).  The ITC "is not required to gather 100% coverage in the questionnaire responses before it can make a determination."  *United States Steel Group v. United States*, 18 CIT 1190, 1203, 873 F. Supp. 673, 688 (1994), *aff'd* 96 F.3d 1352 (Fed. Cir. 1996).

*World Bearings China Outlook* report, published by The Freedonia Group in 2000, predicts[23]

increases in exports of ball bearings from China, whereas the Staff Report projections indicate a

decline in exports, both in quantity and value terms.  *See id.*; Staff Report, tbl. VII-1.  This

shows, in ABMA's view, that data from the questionnaire responses was unreliable.  For its part,

the ITC asserts that ABMA has merely "point[ed] to . . . information domestic parties placed on

the record, [and] characterize[d] them as 'official'" which in itself "does not establish an absence

of substantial evidence support for the ITC's finding."  Def.'s Resp. at 38.

The court declines ABMA's invitation to reweigh the evidence on the record.  First, it is

presumed that the ITC has considered all of the information on the record.  *See Rhone Poulenc,*

*S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984) ("Absent some showing to

the contrary, the Commission is presumed to have considered all evidence in the record.").  Here,

however, the brief containing the report submitted by ABMA was cited by the ITC in the Final

Determination.  Final Determination at 26 n.134 (citing Pl.'s Prehearing Br.).  Even if it could be

shown that the ITC did not consider this report, however, the court would not find that it

undermined the substantiality of the record evidence supporting the ITC's finding on capacity

utilization, because it does not appear to be any more reliable or accurate than the actual data

obtained from the Chinese producers.  Although ABMA refers to *World Bearings China Outlook*

as an "official" report, the report itself bears no indicia of officiality and is apparently an analysis

by a private market research firm.  In addition, although the report makes certain predictions

---

[23]     The Freedonia Group appears to base its predictions on forecasts with respect to supply and demand, bearing sales by application, and bearing shipments by type. *See* Pl.'s Prehearing Br., Ex. 7 (*World Bearings China Outlook*).

about Chinese bearing production, it makes no reference to its methodology. In particular, it in no way ties its conclusions to excess Chinese capacity. The weight to give to a piece of evidence is a matter within the ITC's discretion, and it is for the ITC to resolve conflicts in the record. *Matsushita*, 750 F.2d at 933. As noted by the ITC, no party has come forth with evidence that unreported capacity in China, which was apparently for production of products other than the subject merchandise, could result in the increased production of ball bearings in the imminent future. Taking into consideration the ITC's finding that the volume of subject imports was not presently affecting domestic prices in any significant way, and the lack of evidence that would indicate any imminent change in the volume of subject imports, the existence of unreported capacity did not provide a basis for an affirmative threat finding. Thus, the ITC's finding with respect to capacity is sustained.

ABMA next challenges the ITC's finding with respect to inventories. The ITC found that "[i]nventories of complete ball bearings held by producers in China have not grown significantly over the POI, and inventories held by importers in the United States at the end of 2002 were at the lowest level of the POI. Consequently, inventory levels do not support an affirmative threat determination." Final Determination at 33. ABMA claims that the ITC "failed to appreciate China's large inventories," Pl.'s Mem. at 36, arguing that although the ITC referred to the lack of significant growth in Chinese inventories over the period of investigation, it "failed to acknowledge that China's inventories were still high in absolute terms." *Id*. The ITC argues that since the levels of inventory did not result in injury during the period of investigation, there was no reason to believe that these same levels would result in injury in the future. *See* Def.'s Resp.

at 39.

The statute instructs the ITC generally that it shall consider "inventories of the subject merchandise . . . ." 19 U.S.C. § 1677(7)(F)(i)(V). It does not provide any further guidance as to what significance the ITC should attach to this factor, or the method by which it should be evaluated. Here, the ITC clearly considered inventories when it evaluated whether there was any significant growth in the level of inventories held by Chinese producers over the period of investigation. Not finding any significant growth,[24] and also noting that U.S. importer inventories were at their lowest at the end of 2002,[25] the ITC did not find that inventory levels supported an affirmative threat determination.

The authority to make a judgment as to the significance of inventory levels or what level

---

[24] The underlying record supports this finding. End of period inventory levels in China of complete ball bearings were at 74,744 in 2002, down from 74,830 in 2001 and up from 72,419 in 2000. Those levels were projected to drop in 2003, to 41,159, and again in 2004, to 38,567. Staff Report, tbl. VII-1-A. U.S. importers' end of period inventory levels of complete ball bearings were at 49,428 in 2002, down from 54,691 in 2001 and 51,263 in 2000. *Id.*, tbl. VII-3.

[25] The ITC states that its inquiry with respect to inventories is

> whether inventories at the end of the period, whether held in China
> or by U.S. importers, significantly exceed year-end inventories
> earlier in the period. This is because inventories are an integral,
> inescapable consequence of manufacture and sale of products, and
> do not, in themselves, indicate a threat of increased subject import
> shipments separate from any capacity and production analysis,
> unless those inventories are highest at the end of the period.

Def.'s Resp. at 38–39.

of inventories is considered high or low rests with the ITC, in light of the facts of each case. *See Chung Ling Co. v. United States*, 16 CIT 843, 846, 805 F. Supp. 56, 61 (1992) ("[D]iscretion to make reasonable judgments and inferences in interpreting evidence and determining the overall significance of any particular fact or piece of evidence" rests with the ITC). The inquiry with which the court is concerned is whether the evidence reasonably supports the ITC's decision. It was reasonable for the ITC to conclude that since inventories in China did not significantly change over the period of investigation and ended lower in 2002 than in 2001, such inventories did not support a finding that subject imports posed an *imminent* threat of material injury. As the evidence supports the ITC's findings with respect to inventories they are sustained.

Finally, ABMA challenges the ITC's finding with respect to future price effects. The ITC found:

> [A]t their current volume levels, subject imports did not have significant price-depressing or -suppressing effects on the domestic like product during the POI. Because we do not believe that there is a likelihood of substantially increased import volumes, we conclude it is likely that the subject imports will continue not to have significant price effects in the imminent future.

Final Determination at 32–33. ABMA argues that the ITC acted contrary to the statute by relying on its findings with respect to current price effects, Pl.'s Mem. at 37, but does not suggest a method that the ITC should have applied.[26] Rather, ABMA proposes the following:

---

[26] Nothing in the threat statute forbids the ITC from considering the volume and price effects findings it is obligated to make with respect to present material injury. While the "absence of any *indicia* of *present* injury is not considered conclusive that *threat* of injury does not exist," the findings made with respect to whether there is present material injury are relevant. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 17 CIT 146, 150, 818 F. Supp. 348,

(continued...)

> Faced with continued competitive pressure from aggressively priced Chinese imports, the domestic industry would be forced to cut prices even more [than they did during the period of investigation] in order to avoid losing more sales, revenue, and market share. Moreover, these low prices and the significant underselling would be likely to generate greater demand for Chinese products.

*Id*. at 38. According to the ITC, this "alternate scenario" amounts to speculation, and as such is an insufficient basis upon which to make a threat determination. Def.'s Resp. at 40 (citing 19 U.S.C. § 1677(7)(F)(ii)).

The court is not convinced that the ITC has made any error with respect to its future price effects finding. While "[a] threat of material injury determination necessarily involves a prediction of the future," speculation may not be the basis of an affirmative threat determination. *Comm. for Fair Beam Imps.*, 27 CIT at __ slip op. 03-73 at 41. ABMA's proposed sequence of future events, while plausible, amounts to mere speculation and is not the basis for an affirmative threat determination. "That [ABMA] can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive." *Matsushita*, 750 F.2d at 936. ABMA has not shown that the ITC's findings with respect to capacity, inventories, and future price effects are unsupported by the evidence but rather has urged a different interpretation of the

---

[26](...continued)
354 (1993) (emphasis in original) (citing *Rhone Poulenc*, 592 F. Supp. at 1323–24 (citing H. REP. NO. 317, 96th Cong., 1st Session 47 (1979)); *Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir. 2000) ("For a threat determination, § 1677(7)(F)(i) sets forth relevant economic factors the ITC must consider, including material injury caused by imports or sales for importation."). Therefore, it was not improper for the ITC to consider its findings with respect to price effects.

record evidence than that made by the ITC.  No challenge has been made to the ITC's findings

with respect to the remaining factors.  The ITC's threat determination satisfies the substantial

evidence standard, and accordingly, it is sustained.


CONCLUSION

For the reasons stated above, ABMA's motion for judgment upon an agency record is

denied, the ITC's Final Determination is sustained, and this case is dismissed.  Judgment shall be

entered accordingly.


_____ /s/ Richard K. Eaton _____


Dated: September 16, 2004
        New York, New York